NORTHERN ASSURANCE Co. *et al.* v. J. J. NEWMAN LUMBER Co.

[63 South. 209.]

1. INSURANCE. *Brokers. Insured's agent. Scope of agency. Cancellation. What constitutes.*

Where insured placed their insurance business entirely in the hands of their brokers, with the understanding, expressed or implied, that they would see to it that they had sufficient insurance at all times, and when it became necessary to cancel any policy, the brokers were expected to cancel, provided they secured other insurance to take its place, such insurance brokers were the general agents of the insured in keeping their property insured and were therefore authorized to accept and agree upon cancellation.

2. INSURANCE. *Cancellation by agreement. What constitutes.*

Where the agent of insured telegraphed that the insured would not accept a proposed change in the rate and asked if the

policies would stand, to which the reply was that the insurance company demanded a higher rate, whereupon the insured's agent wrote back, that there was nothing to do but cancel the policies, this was an agreement for the cancellation and relieved the insurance companies from giving notice that the policies had been cancelled.

3. APPEAL AND ERROR. *Review. Construction of written documents. Findings of chancellor.*

Where there is a conflict of evidence upon a material fact, the findings of the chancellor will not be disturbed on appeal; but when it becomes necessary for the supreme court to construe written documents, it will follow its own construction and not the chancellors.

APPEAL from the chancery court of Adams county.

HON. J. S. HICKS, Chancellor.

Suit by J. J. Newman Lumber Company against the Northern Assurance Company and others. From a judgment for plaintiff, defendants appeal.

The facts are fully stated in the opinion of the court.

*McLaurin, Armistead & Brien,* attorneys for appellant.

*Truly, Ratcliff & Truly,* attorneys for appellees.

Counsel on both sides filed elaborate briefs, too long for publication.

COOK, J., delivered the opinion of the court.

Appellee began this action in the chancery court of Adams county against appellants, seven insurance companies, on policies written by them, to recover their *pro rata* of the loss by fire of the lumber plant of appellee at Hattiesburg on the 17th day of March, 1908. The defense of the insurance companies is that the policies were canceled before the fire, either by the insured, or by the mutual agreement of the insured and the insurers. In his finding of facts, the chancellor decreed that the policies had not been canceled before the fire, and that they were

105 Miss. 44

valid and binding at the time of the fire. Five of the policies involved were issued October 23, 1907, one November 23, 1907, and the other one February 23, 1908.

All of the policies covered both the Hattiesburg plant No. 1 and the Sumrall plant No. 3, and were obtained by Fulton & Bradbury, insurance brokers, of Scranton, Pa., and were written by the insurance agency of McLeod & Gunter and the McLeod Insurance Agency, of Hattiesburg, Miss. When these policies were written, it was the understanding between the insured and the agent for the insurers that certain improvements should be made by appellee for the purpose of reducing the hazard, and unless this was done that an advance in rate and a change in the form of the risk would be attached to each policy. At the time these policies were issued, there were a number of other policies issued in other agencies and in other companies, and the same agreement was had about improvements with the agents of other companies. All of the insurance was obtained by the same brokers, Fulton & Bradbury, of Scranton, Pa. On November 23, 1907, Fulton & Bradbury wrote a letter to the McLeod agency at Hattiesburg, viz.:

"Scranton, Pa., November 23, 1907.

"Messrs. McLeod & Gunter, Hattiesburg, Mississippi —Gentlemen: We telegraphed you last night as follows: 'Improvements at Newman Hattiesburg plant all completed, except dry kilns and planing mill. Rating company suggests that policies be not issued till improvements all finished. Mr. Major desires a few days' more time. Kindly call at Newman office Saturday morning and indorse on binders they now have thirty day extension. Lines on other plant to follow.' We had to do this, as the rating company preferred not to have policies issued until the improvements are all completed. We were sorry to have to trouble you to extend the binder; but Mr. Major requested that it be done, and we could not see any way out of it. We think, however, that it will

only be for a few days, as Mr. Major informs us that
the work that is yet to be done is progressing, and we
hope that it will only be a small portion of the thirty
days before they are finished. You can rest assured we
will do everything possible to hurry the matter, and trust
that you will bear with the assured and all concerned for
a little while longer. We might say that we had a case
of this kind ourselves regarding a street railway line,
which we kept binding for nearly six months, and then the
companies allowed us to use the reduced rates by dating
the policies back for six months; but in the case of the
Newmans we certainly think that they will not keep you
waiting but a few days longer, when we will have the
rates named and advise you to write up the policies. We
are glad to be able to send you an order for twenty-five
thousand dollars on the new No. 3 plant, which we wired
you to day, and hope from now on we will have orders
to give you right along on the different plants of this
company, and to be able in some way to return the favor
for your many kind considerations to us and the assured
in making the extensions of the binder to-day, as re-
quested. Again thanking you for your kind considera-
tions, we are, yours truly,

"C W F/A. M.              FULTON & BRADBURY."

On March 8, 1908, Fulton & Bradbury wired the Mc-
Leod Agency as follows:

"Scranton, Pa. Mch. 9—08.

"McLeod & Gunter, Hbg. Miss. Reference Hatties-
burg and Sumrall Newman policies assured will accept
no change in forms or rates wire us immediately if your
policies will hold as originally written.

"11 26 Am.                 FULTON & BRADBURY."

To this telegram, McLeod Agency replied by wire as
follows:

"Hattiesburg, Miss., March 9, 1908.

"To Fulton & Bradbury, Scranton, Pa. Our compa-
nies demand change in form and advance in rate.

"McLeod Insurance Agency."

March 11, 1908, Fulton & Bradbury wrote the following letter to the Hattiesburg Agency:

"Scranton, Pa., March 11, 1908.

"Messrs. McLeod & Gunter, Hattiesburg, Mississippi —Gentlemen: The writer finds that it will be impossible to go to Hattiesburg this month as intended. Referring to your telegram of the 9th instant, would say that we are very sorry that you did not advise us at the time you took the matter up with the Newman people regarding change in form and advance in rate, as they will not stand for any of these changes; and as you say in your telegram that your companies demand the advance in rate and change of form, there is nothing left to do but cancel the policies *pro rata,* as the other agents have done. The other agents gave us until March 1st to decide whether it would be an advance in rate or cancellation, as they said they wanted to know by that time, so as to be able to return their policies and get credit for same in their February account. As you did not do this, it complicates the matter still further, and we are at a loss to know how best to handle the situation. As it may be that you paid for these policies, which will have to be canceled, we inclose herewith a thirty-day acceptance with eight per cent. interest added for you to use in case you have paid your companies for these policies and cannot get credit for the return premiums until next month. We explained the matter to our bank, and told them that the policies would be canceled, for which our check to you for six hundred and seventeen dollars and ninety cents was payment; and, this being the case, we asked them to return the check not paid. As we said before, we wish that you had told us last month that your companies demanded the extra premium and change of form, as in the case of the other agents, so that the matter would not be complicated as it is now. We want to be perfectly fair, and you will notice that we have included the interest in the

acceptance, so that you will not be out anything, and all you will be required to do is to sign the acceptance and use it in your bank until you get credit for your return premiums next month—in case you have already paid for this business. Of course, it seems a little strange to us why you would change the forms and advance the rates on these policies without first conferring with us, but we learned that some special agent was rather instrumental in having the agents make this change, and we presume that you thought that you should follow the rest. Now, regarding the lines for your companies later, we feel quite sure that we can get these risks in such shape that your companies will be perfectly satisfied to again write on the property, and we wish to say that we will do our very best to have the improvements all completed, so that we will be able to again offer you lines on these properties, and think that if you will just leave this matter with us we will more than satisfy you in this respect. You will, of course, cancel the policies *pro rata,* as the assured will not agree to any advance in rates or change in forms, and there is nothing to be done but cancel the policies *pro rata,* as the other agents have already done. Now, we wish that you would accept the situation as it is, and not blame us for doing as we have done, as you can see how the matter stood when we got your telegram saying that your companies demanded an increased rate and change in forms. So we thought the way out, as we have already stated, would be the best way to handle the matter. As we said before, we feel quite sure we can again give you lines for your companies in a very short time, so that we will make up to you for any disappointment that you may now have. We therefore hope that you will accept this letter in the spirit that it is written. We will have the Newman people send us your policies, so that we may check them off, and then we will forward them to you for cancellation. Trusting that the foregoing will be perfectly satisfactory and

agreeable to you, we beg to remain, with personal regards, yours very truly,

"C W F/A. M.                    FULTON & BRADBURY.

"P. S. If there is any expense in connection with the return of the check, please let us know, and we will remit to you for same.                    F. & B."

The fire occurred six days after the date of the foregoing letter, and the Newman Lumber Company, through Fulton & Bradbury, insisted that the policies were still in force; that the insurance companies had not canceled same by giving five days' notice of cancellation as required by the terms of the policies. It is the contention of the insurers that Fulton & Bradbury, by the telegram of March 9th, and the letter of March 11th, acknowledging receipt of reply to their telegram, either directed the cancellation of the policies, or signified their agreement to a cancellation, as the insured would not stand for the raise of rates and change of forms, and, as the insurers would not agree that the policies should hold as originally written, there was nothing else to be done.

Appellee says the telegrams and letter will not bear the construction put upon them by appellants, but, if they may be so construed, then Fulton & Bradbury did not have authority to accept cancellation, or direct the cancellation of the policies—that they were merely agents to obtain insurance, and not agents to cancel insurance. If it is true that Fulton & Bradbury did not possess the power to cancel the policies, the case is ended, and the decree of the chancellor must be affirmed.

Briefly stated, the record discloses that the brokers were commissioned to obtain insurance for the owners in reputable and solvent companies of their own selection, and to keep the property fully covered at all times; and while the superintendent does say that they had no authority to cancel policies, we gather from the entire testimony of the superintendent that the brokers had full authority to secure insurance and cancel any policy ob-

tained by them, provided they kept the property covered by securing some solvent company to issue a policy in lieu of the one canceled. In other words, the Newman Lumber Company placed their insurance business entirely in the hands of their brokers, with the understanding, expressed, or implied, that they would see to it that they had sufficient insurance at all times, and, when it became necessary to cancel any policy, the brokers were expected to cancel, provided they secured their other insurance to take its place. If this is a correct statement of the facts, and we think it is, the insurance brokers were the general agents of the insured in keeping their property insured, and therefore were authorized to accept and agree upon cancellation. *Insurance Co.* v. *Renno,* 96 Miss. 172, 50 South. 563.

The next point is: Did the brokers cancel the policies, or agree with the agents of the insurance companies to cancel the same? As this query must be answered by the construction of telegrams and letters, in the light of the undisputed facts, we must rely upon our interpretation of the written evidence, without in any way being influenced by the chancellor's findings.

Where there is a conflict of evidence upon a material fact, the findings of the chancellor will not be disturbed: but when it becomes necessary for this court to construe written documents, we must follow our construction, and not the chancellor's. The telegram of the 9th of March sent by the brokers to the insurance agents was not to inquire about the agreement to improve the plant, but was a recognition that there was an agreement for improvements, and also for their knowledge of the consequences which would follow the refusal or failure to comply with the agreement. The insured had not made the improvements and would not stand for the raise of rates and change in forms. Will the policies still hold as originally written? This is what the telegram means, and, replying, the insurance agents said, ''The policies will

not stand as written." The insured announced its *ulti-matum*, and the insurer accepted it. We are not to be understood as holding that the terms of the written contract of insurance can be varied by a contemporaneous verbal understanding; but we do not think that this understanding, or agreement, sheds a flood of light upon the telegrams exchanged by the agents of the insured and the agents of the insurers.

The insurance brokers knew that the insurance companies would expect a raise of rates and change of form, and they were advised by their principal that it would not stand for these changes, and so, in good faith, the brokers advised the insurance agents of their principal's position; and the telegram goes much further, viz.: "Wire us immediately if your policies will hold as originally written." The answer, "Our companies demand change in form and advance in rates," in effect gave notice that the policies would no longer be in force; and when the brokers received the answer, their letter of March 11th shows that they understood that, if the insurance companies would not agree to the terms proposed by the Newman Lumber Company, there was nothing to do except to agree to a cancellation of the policies, and that is exactly what they did. The letter of November 23, 1907, from Fulton & Bradbury to the McLeod Agency, recognizes the obligation of the insured to make the improvements, and pleads for an extension of thirty days.

There can be no doubt that it was the understanding of the parties to the insurance contract that the insured would make the improvements at once. This agreement was oral, and was confirmed by the letter of the 23d of November. On March 9, 1908, after having enjoyed the benefit of the low rate for about five months, the agent of the Newman Lumber Company announced to the insurance agency that their clients repudiated the agreement and would not stand for any change of rates, and asked the insurance companies if they would still carry

the risk at the rate fixed in the policies. The insurance companies' answer, properly interpreted, meant that they would carry the risk no longer. The letter of Fulton & Bradbury of March 11th acknowledges the receipt of the telegram of McLeod Agency, and at great length expresses their regret that the Newman Lumber Company had seen fit to repudiate the agreement. The brokers inclose in their letter their acceptance to the insurance agency to compensate them for their loss. At the very least, it seems to us that the letter of the insurance brokers must be construed as accepting the telegram as a cancellation and agreeing thereto.

It is unnecessary to decide whether or not the two telegrams alone constitute a cancellation, because it seems clear to us that the telegrams and the letter of March 11th show that the parties agreed to a cancellation. The claim of the assured that the cancellation would be upon the *pro rata* basis, and the acceptance calculated upon that basis, sent to the insurance agents to indemnify them against possible loss, would seem to establish the fact that the Scranton brokers regarded the matter as closed. The acceptance and retention of the acceptance by the insurance agents put the two interests in complete accord.

Reversed, and judgment here for appellants.

*Reversed.*